**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RUBEN ESCANO,

     Plaintiff,

v.

RCI, LLC, a Delaware Corporation et al.

     Defendants.

Case No. 2:22-cv-00360-DHU-GJF

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT RCI, LLC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ruben Escano, undersigned, hereby respectfully responds in opposition to Defendant RCI, LLC's ("RCI") Motion for Summary Judgment (Doc. 164) (the "Motion" or "Mot.").  For the reasons set forth below, the Motion should be denied.

## I.  <u>Introduction</u>

As the movant, it is RCI's burden to either point to admissible evidence supporting its contention that it is not liable for the telemarketing calls at issue, or indicate to the Court that there is a lack of evidence supporting Plaintiff's claims.  Knowing that there is not a scintilla of evidence supporting the assertion that RCI *is not* liable for the telemarketing calls at issue, the Motion takes the second approach, and simply ignores much of Plaintiff's evidence showing that RCI indeed is liable.

The Motion ignores the fact that all of the resorts Plaintiff was encouraged to visit during the calls are resorts within RCI's timeshare exchange network.  The Motion ignores the fact that executives of Defendant Mexican Riviera Resorts Unlimited, S.A. de C.V. ("MXRRU") have been engaged in a decade-long, international telemarketing scheme to generate tours to sales rooms at

these resorts, where visitors are enrolled in RCI's memberships.  The Motion ignores the fact that RCI provided training, marketing material, and sales awards to entities selling RCI memberships at these sales rooms.  And the Motion ignores the fact that RCI's parent company reports to its shareholders that it engages marketing agents that encourage prospective timeshare owners to visit resorts and attend sales presentations at sales rooms at those resorts.  As explained more fully below, the evidence shows that there are genuine issues for trial and the Motion should be denied.

## II.   <u>Statement of Disputed Facts</u>

1. Undisputed.

2. Disputed. *See* Declaration of Ruben J. Escano, attached hereto as **Exhibit A**, at ¶ 32.

3. Disputed. *See id.*

4. Disputed. *See id.*

5. Disputed. *See id.*

6. Undisputed that RCI phone calls regarding timeshare exchanges *to members* originate from Carmel, Indiana and are identified using a phone number beginning with the area code 317.

7. Undisputed.

8. Disputed. *See* Wyndham Destinations, Inc. 2018 SEC Form 10-K, attached hereto as **Exhibit B**, at 10, 43.

9. Undisputed that Plaintiff has identified only one call in which "RCI" or "Resort Condominiums International" was referred to by name.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Undisputed.

15. Undisputed.

16. Undisputed.

17. Undisputed.

18. Undisputed.

19. Undisputed.

20. Undisputed.

21. Undisputed.

III.    **Plaintiff's Additional Material Facts**

       **The Phone Calls at Issue**

    A.     On October 18, 2008, Plaintiff registered his phone number ending in -8938 on the Federal Trade Commission's National Do Not Call Registry, and it has been listed on the registry ever since. Ex. A at ¶ 2; Plaintiff's Do Not Call Registry Email Confirmation, attached hereto as **Exhibit C**.

    B.     Prior to February 8, 2018, Plaintiff did not have any business relationships with RCI; MXRRU; Timescape Resorts, LLC; or any related entities or persons. Ex. A at ¶ 3.

    C.     Between February 8, 2018 and continuing to January 20, 2021, Plaintiff received twenty-seven unsolicited phone calls on his cell phone, which began with prerecorded messages announcing the calls as coming from any of the following hospitality brands: Marriott Hotels, Hyatt Hotels, Booking.com, Disney World, and Hilton Hotels. Ex. A at ¶ 4; Compilation Phone Bills, attached hereto as **Exhibit D**; Compilation Audio Recording Transcripts, attached hereto as **Exhibit E**

D.      At least two of the calls included more than 24 seconds of hold music after the prerecorded message and prior to a phone representative coming on the line. (Ex. A at ¶ 6).

E.      All of the prerecorded messages were made with the same woman's voice and with similar excited intonations and cadence. (*Id.* at ¶ 10).

F.      All of the prerecorded messages announced a supposedly exclusive or pre-selected deal on vacation packages. (*Id.* at ¶11).

G.      All of the pricing given during the calls was for $999. (*Id.* at ¶ 12).

H.      The callers spoofed the phone numbers from which they called so that Plaintiff's cell phone would show inaccurate caller ID information. (*Id.* at ¶ 20).

I.      During a February 8, 2018 call, a phone representative offered Plaintiff a $999 vacation package to the BlueBay Grand Esmeralda in Cancun, Mexico, and the Reserve at Paradisus in Punta Cana, Dominican Republic. (*Id.* at ¶ 13).  The phone representative offered the vacation package contingent on Plaintiff attending a 90-minute tour of the resort. (*Id.* at ¶ 17).

J.      During an April 3, 2018 call, a phone representative offered Plaintiff a $999 vacation package to the Laguna Suites Golf and Spa Hotel, and the Ocean Spa Hotel, both in Cancun, Mexico; and Villas Sol Hotel and Beach Resort in Costa Rica. (Ex. A at ¶ 14).  The phone representative offered the vacation package contingent on Plaintiff attending a 90-minute timeshare tour. (*Id.* at ¶ 18).

K.      During the April 3, 2018 call, a phone representative stated, "I'm in a huge call center with over a hundred in the room right now." (Ex. E at 34; April 3, 2018 Call Transcript at 22).

L.      During an April 16, 2018 call, a phone representative offered Plaintiff a vacation package to the BlueBay Grand Esmeralda in Cancun, Mexico. (Ex. A at ¶ 15).

M.      During an August 24, 2020 call, a phone representative offered Plaintiff a $999 vacation package to Calypso Cay Resort in Florida. (*Id.* at ¶ 16).

N.      During a May 1, 2018 call; a May 3, 2018 call; and a September 10, 2019 call, Plaintiff spoke with phone representatives and requested that they place his phone number on a "do not call" list. (*Id.* at ¶ 19).

O.      On or around January 14, 2021, Plaintiff sent demand letters to RCI, Timescape, and affiliates of MXRRU. (*Id.* at ¶ 21).  The letters threatened legal action for the telemarketing calls.[1] (*Id.*)

P.      After Plaintiff sent the demand letters, Plaintiff received only one more call—the January 20, 2021 call. (*Id.* at ¶ 22).

**MXRRU**

Q.      During the April 3, 2018 call, Plaintiff gave his credit card information to a phone representative in attempt to investigate the source of the call. (*Id.* at ¶ 23).  Plaintiff's credit statement showed a subsequent charge from "MXRRU." Plaintiff's Credit Card Statement, attached hereto as **Exhibit F**.

R.      During the April 3, 2018 call, a phone representative told Plaintiff that, "the people that are processing your card are the same people that you deal with if you decide to purchase into timeshare [sic]." (Ex. E at 27; April 3, 2018 Call Transcript at 16).

S.      MXRRU admits it has copies of call logs related to this case. MXRRU's Initial Disclosures, attached hereto as **Exhibit G**, at 2.

T.      An officer of MXRRU is a man named Orlando Arroyo. MXRRU Compilation Annual Reports, attached hereto as **Exhibit H**.

---

[1] Plaintiff also sent a demand letter to Marriott Vacations Worldwide Corporation.  However, it responded by vehemently denying its involvement, and saying other entities were making calls purporting to be from Marriott.

U.      In 2011, the Canadian Radio-television Telecommunications Commission ("CRTC") found that Mr. Arroyo's companies were making tens of thousands of automatically-dialed calls to Canadian consumers, including many who had listed their phone numbers on the Canadian National Do Not Call List. 2011 CRTC Letter to Orlando Arroyo, attached hereto as **Exhibit I**. According to the CRTC, the callers purported to be calling from "well-known Canadian corporations." (*Id.*).

V.      Orlando Arroyo owns Sunset World Group, which is also known as Sunset World Resorts. Deposition of Crystian Alatorre, filed contemporaneously under seal as **Exhibit J**, at 26:18–20, 46:12–13.

W.      Promotora Sunset Beach Clubs S.A. de C.V. ("Promotora") is the official name for Sunset World Group. RCI Amendment to Affiliation Agreement, filed contemporaneously under seal as **Exhibit K**, at 1.

X.      Sunset World Group includes Laguna Suites Golf and Spa, and Ocean Spa Hotel. Sunset World Resorts Webpage, attached hereto as **Exhibit L**.

Y.      In 2017, the Federal Communications Commission found that, in 2016, a man named Adrian Abramovich made nearly a 100 million robocalls on behalf of travel companies associated with senior executives and managers of Sunset World Group. 2017 FCC Notice, attached hereto as **Exhibit M**, at 4. According to the FCC, the robocalls began with prerecorded messages about an "'exclusive' vacation deal offered by a well-known travel or hospitality company such as . . . Mariott, or Hilton." (*Id.*).

Z.      Both the 2011 CRTC finding and 2017 FCC finding were publicized in the news media. Law360 Article, attached hereto as **Exhibit N**; Miami New Times Article, attached hereto as **Exhibit O**; Yahoo News Article, attached hereto as **Exhibit P**.

**RCI**

AA.     During the February 8, 2018 call, a phone representative stated, "We're a marketing division under RCI[.]" (Ex. A at ¶ 32; Ex. E at 10; February 8, 2018 Return Call Transcript at 4).

BB.     The BlueBay Grand Esmeralda, the Reserve at Paradisus, the Villas Sol Hotel and Beach Resort, the Laguna Suites Golf and Spa Hotel, the Ocean Spa Hotel, and the Calypso Cay Resort are all within RCI's timeshare exchange network. (Ex. J at 34:11–35:1).

CC.     RCI memberships are offered at sales rooms at the BlueBay Grand Esmeralda, Reserve at Paradisus, the Sunset World Resorts, and the Calypso Cay Resort. (Ex. J at 52:6–55:4); Deposition of Stephen Bradley, attached hereto as **Exhibit Q**, at 122:24–124:19.

DD.     In 2018, the parent company of RCI was Wyndham Destinations, Inc. ("Wyndham"). (Ex. B at 15).

EE.     Wyndham's SEC Form 10-K for the fiscal year ended December 31, 2018 states:

> We employ a variety of marketing channels to encourage prospective owners of VOIs [Vacation Ownership Interests] to tour our properties and attend sales presentations at our resort-based sales centers as well as off-site sales offices.
>
> [. . .]
>
> Our marketing agents, who often operate on the premises of the hospitality, entertainment, gaming and retail companies with which we have alliances, solicit tourists with offers relating to entertainment activities and other incentives in exchange for the tourists visiting the local resorts and attending sales presentations.

(*Id.* at 10).

FF.     Wyndham's SEC Form 10-K for the fiscal year ended December 31, 2018 includes a table with the number of "tours taken by guests in our efforts to sell VOIs." (*Id.* at 43).

GG.     RCI's "business development team" provides training to resorts within RCI's timeshare exchange network on the manner in which to present RCI products and how they should be positioned to prospective members. (Ex. J at 35:5–37:3, 76:11–77:4).

HH.     RCI permits sales teams at the sales rooms to use RCI branding and logos on marketing material. (*Id.* at 106:18–110:15).

II.     An agreement between Mr. Arroyo and RCI requires that "sales reports" be submitted to RCI in a format specified by RCI. (Ex. K at 7).

JJ.     An agreement between Mr. Arroyo and RCI states that the company Mr. Arroyo represents "contacted RCI requesting its support to evaluate the [company's] needs and, upon assessment, to provide access to promote in its Sales Rooms . . . RCI® Platinum, a tool aimed at increasing the closing percentage of sales of its Vacation Club Memberships[.]" RCI Amendment to Affiliation Agreement, filed contemporaneously under seal as **Exhibit R**, at 1.

KK.     In 2020, RCI awarded Mr. Arroyo with RCI's President's Award. PRWeb.com Press Release, attached hereto as **Exhibit S**; (MXRRU's Answer to Plaintiff's First Amended Complaint, Doc. 63 at ¶ 73).

LL.     The President's Award is awarded based on the amount of revenue generated for RCI. (Ex. J at 68:20–69:19).

MM.     RCI awards the salesperson with the most enrollments of RCI memberships at a particular sales room with RCI's "Top Seller" award. (*Id.* at 63:5–67:18).

## IV.    Relevant Procedural History

On April 6, 2023, Plaintiff filed his First Amended Complaint ("FAC") (Doc. 80), after being granted leave by the Court, (Doc. 79).  At present, the FAC is the operative complaint.[2]  The FAC alleges that between February 8, 2018 and January 20, 2021, Plaintiff received twenty-seven automatically-dialed robocalls which all began with prerecorded messages. (FAC at ¶¶ 2, 15).  The FAC alleges the prerecorded messages falsely announced the calls as coming from well-known hotel brands. (*Id.* at ¶ 44).  The FAC alleges that the calls were actually made to promote vacation packages at unrelated resorts. (*Id.*).  And, the FAC alleges, as a condition of purchasing the vacation packages, phone representatives required Plaintiff to attend a tour and presentation at the resort for the respective vacation package. (*Id.* at ¶ 74).  Despite the Motion's assertion to the contrary (at 7), Plaintiff indeed does make an allegation on information and belief: "Upon information and belief, the tour and presentation would consist of a sales pitch to entice Plaintiff to buy a timeshare at the respective resort for the vacation package." (*Id.* at ¶ 75).

Accordingly, the FAC brings fifteen counts: eight counts under the U.S. Telephone Consumer Protection Act ("TCPA"), *see* (FAC at ¶¶ 119–144); six counts under the New Mexico Unfair Practices Act ("NMUPA"), *see* (FAC at ¶¶ 142–166); and one count under the common law theory of trespass to chattels, *see* (FAC ¶¶ 167–175).  The FAC primarily seeks damages.  The core allegations are that the Defendants, including RCI, are liable to Plaintiff under these fifteen counts for the calls at issue. *See* (FAC at ¶¶ 124, 127, 130, 133, 137, 141, 144, 148, 152, 157, 160, 166, 175).  As to RCI, the FAC alleges that RCI is vicariously liable, including under theories of apparent authority and ratification. (*Id.* at ¶¶ 78, 82).  The FAC alternatively alleges that RCI is directly liable. (*Id.* at ¶ 79).

---

[2] On October 3, 2023, Plaintiff filed a motion seeking leave to file a second amended complaint. (Doc. 152).  However, on March 4, 2024, the Court denied that motion, primarily because it was untimely, being filed a day after the close of discovery. (Doc. 190) (Doc. 203).

V.    **Standard of Review**

A party is entitled to a summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Apex Collision Ctr. Clovis, LP v. Sec. Nat'l Ins. Co.*, Civ. No. 2:21-cv-00841, at *8 (D.N.M. Aug. 15, 2023) (Urias, J.) (quoting *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).  "A fact is material if it can have an impact on the outcome of the lawsuit and genuine if a rational jury could find in favor of the non-moving party based on the evidence presented." *Id.* (quoting *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021)).  "The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact." *Id.* (citing *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

"If the moving party does not bear the burden of proof at trial on a dispositive issue, that party may make such a showing simply by indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* (quoting *Sally Beauty Co.*, 304 F.3d 964, 971).  "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Sally Beauty Co.*, 304 F.3d 964, 971).  "The district court's role in analyzing a motion for summary judgment is to simply 'assess whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005)).  "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing

the motion." *Id.* at *9 (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))).

**VI.**   <u>**Argument**</u>

    **A.**   <u>**There is sufficient evidence showing RCI is directly liable for the calls at issue.**</u>

        The Motion argues (at 11) that RCI is entitled to summary judgment with respect to direct liability.  But there is sufficient evidence showing RCI made the calls and is thus directly liable for them.  During the February 8, 2018 call, a phone representative stated, "We're a marketing division under RCI[.]" (Ex. A at ¶ 32).  Because of this evidence, there is a genuine issue for trial as to whether RCI initiated the calls, from within its "marketing division."

        The Motion relies on the fact that the February 8, 2018 call is barred by the applicable four-year statute of limitations. (Mot. at 11–13).  But the Motion confuses the issue.  Even though Plaintiff may not be able to collect an award for this particular call, Plaintiff can still present facts from this call as evidence.  As shown in the audio recordings of the calls and Plaintiff's declaration, all of the twenty-seven calls, including the February 8, 2018 call, bore similarities: (i) they all began with prerecorded messages of the same woman's voice, (ii) the prerecorded messages all had similar excited intonations and cadence, (iii) the prerecorded messages all announced a supposedly exclusive or pre-selected deal on vacation packages, (iv) all of the pricing given on vacation packages was for $999, (v) all of the resorts offered were for resorts within RCI's timeshare exchange network, and (vi) after Plaintiff sent his demand letter to the Defendants or their affiliates, he received only one more call. (Ex. A at ¶¶ 10–12, 22; Ex. J at 34:11–35:1).  And

because the February 8, 2018 call bore similarities to the other calls, there exists a genuine issue for trial as to whether RCI's "marketing division" initiated all of these similar calls.[3]

### B.  There is sufficient evidence showing that RCI is vicariously liable for the calls.

The Motion argues (at 13–22) that there is no evidence showing RCI is vicariously liable for the calls.  Not so.  As to vicarious liability, in order to defeat the instant Motion, it is necessary only to establish sufficient evidence showing RCI is liable for the calls.  It is not necessary to establish evidence showing which entity made the calls on behalf of RCI.

Nonetheless, there is sufficient evidence showing MXRRU made the calls on behalf of RCI.  First, during the April 3, 2018 call, Plaintiff's credit card was charged by "MXRRU." (Ex. F).  Second, MXRRU admits it has copies of call logs related to this case. (Ex. G at 2).  Third, an officer of MXRRU and his companies have been connected to multiple federal investigations related to illegal telemarketing where people received automatically-dialed calls purporting to be from well-known hospitality brands. (Ex. I; Ex. M).  Fourth, after Plaintiff sent his demand letter to affiliates of MXRRU, he received only one more call. (Ex. A at ¶ 22).  Having established

---

[3] The Motion makes the troubling assertion (at 12–13, 13 n.4) that Plaintiff concealed the date he received the call in which RCI was mentioned and concealed where he was located when that call was received.  Plaintiff disputes this.  On the first point, Plaintiff did not become aware of Defendants' argument about the statute of limitations until MXRRU presented it at the pleading stage, (Doc. 7 at 1–2).  Also, Plaintiff does not know for certain if RCI was mentioned during only one call.  He did not know what "RCI" was during the February 8, 2018 call. See (Ex. E at 7) (Plaintiff saying, "The RCI? What's the RCI?").  Plaintiff only became aware of RCI in late 2020 when investigating the resorts mentioned during the phone calls and finding they were all within the same timeshare exchange network— RCI's.  It was then that he realized the significance of the mention of RCI in the February 8, 2018 audio recording.  Thus, it is possible RCI was mentioned during other calls (which were not audio recorded), but Plaintiff did not memorialize it in his notes.  On the second jurisdictional point, Plaintiff clearly provided notice to the Defendants that he received only a "preponderance" of the phone calls in New Mexico. (Doc. 1-1 at ¶ 11) (FAC at ¶ 11).  Additionally, the full quote from Plaintiff's brief that RCI references is: "the Motion does not dispute that Plaintiff received the phone calls in New Mexico[.]" (Doc. 43 at 6).  Plaintiff was not saying he received all the calls in New Mexico, only that RCI was not disputing that any of the calls were received in New Mexico.  Nonetheless, RCI waives that jurisdictional challenge. See (Mot. at 13 n.4).

sufficient evidence supporting MXRRU's initiation of the calls, the vicarious liability connection

between MXRRU and RCI is explained further below.[4]

The FCC has long made clear that "the party on whose behalf a solicitation is made bears

ultimate responsibility for any violations." *In re Rules and Regulations Implementing the TCPA*,

10 FCC Rcd. 12391, 12397, ¶ 13 (1995).  The FCC has instructed that defendants may not avoid

liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for
> telemarketing intrusions.  This would particularly be so if the
> telemarketers were judgment proof, unidentifiable, or located
> outside the United States, as is often the case.  Even where third-
> party telemarketers are identifiable, solvent, and amenable to
> judgment limiting liability to the telemarketer that physically places
> the call would make enforcement in many cases substantially more
> expensive and less efficient, since consumers (or law enforcement
> agencies) would be required to sue each marketer separately in order
> to obtain effective relief.  As the FTC noted, because "[s]ellers may
> have thousands of 'independent' marketers, suing one or a few of
> them is unlikely to make a substantive difference for consumer
> privacy."

*In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6588, ¶ 37 (2013).

The FCC has rejected a narrow view of TCPA liability, including the assertion that liability

requires a finding of formal agency and immediate direction and control over the third-party who

placed the telemarketing call. *Id.* at 6587 n.107.  The FCC's 2013 declaratory ruling made clear

that even when a defendant does not initiate calls, they "may be held vicariously liable for certain

third-party telemarketing calls . . . under a broad range of agency principles, including not only

formal agency, but also principles of apparent authority and ratification." *Id.* at ¶ 28.  "Notably, a

plaintiff is only required to demonstrate one of the common law agency theories in order to hold a

---

[4] The Motion notes (at 18–19) that a caller denied calling from Sunset World, but that only emphasizes Plaintiff's
point that the callers were encouraging visits to several resorts, all within RCI's timeshare exchange network.

defendant vicariously liable for another defendant's alleged TCPA violations." *Escano v. Symmetry Fin. Grp. of N.C., LLC*, No. 2:21-cv-0884 RB-GBW, 2022 WL 2072875, at *12 (D.N.M. Jun. 9, 2022) (citation omitted).

When sales presentations promoted during a telemarketing call have "a commercial nexus to a [defendant]'s business, *i.e.*, its property, products, or services," the defendant can be held liable under the TCPA. *See Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017).

### 1.  <u>Actual Authority</u>

"Actual authority stems from a principal's expressions to an agent." *Mohon v. Agentra LLC*, 400 F. Supp. 3d 1189, 1235 (D.N.M. 2019) (citing *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251 (10th Cir. 2013)).  "The agent has actual authority when he, she, or it 'reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent' to engage in an action." *Id.* (quoting *1-800 Contacts*, 722 F.3d at 1251) (internal quotation marks omitted).  "Calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call." *Newell v. Strategic Admin. Grp., Inc.*, No. 2:20-CV-00967-JDW, 2020 WL 12770854, at *1 (E.D. Pa. May 6, 2020) (quoting *In re Rules and Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995)).

There is sufficient evidence showing RCI is liable under a theory of actual authority.  First, the phone calls were made to encourage attendance at sales presentations at resorts within RCI's timeshare exchange network. (Ex. A at ¶¶ 13–17).  During the April 3, 2018 call, a phone representative stated, "I only make my commission whenever I get you to Cancun to attend my timeshare tour." (*Id.* at ¶ 18).  Second, during the April 3, 2018 call, a phone representative told Plaintiff, "the people that are processing your card are the same people that you deal with if you

decide to purchase into timeshare [sic]." (Ex. E at 27; April 3, 2018 Call Transcript at 16).  This shows that MXRRU—the entity processing Plaintiff's credit card—was the same entity not only making the calls, but also conducting sales at the resorts mentioned during the calls (which are all within RCI's timeshare exchange network).

Third, RCI's "business development team" provides training to salespersons at the resorts mentioned during the calls on how to present and position RCI products to prospective members. (Ex. J at 35:5–37:3, 76:11–77:4).  Fourth, RCI requires Mr. Arroyo's company—Sunset World— to submit sales reports in a manner designated by RCI. (Ex. K at 7).  Fifth, RCI tracks not just the number of enrollments produced by resorts within its timeshare exchange network, but also the number of tours at those resorts, whether or not a sale was made. (Ex. B at 43).  Sixth, Mr. Arroyo sought assistance from RCI on "increasing the closing percentage of sales" of Mr. Arroyo's timeshare products. (Ex. R at 1).  Seventh and finally, RCI's parent company reports to its shareholders that it has "marketing agents" operating at resorts, "solicit[ing] tourists with . . . incentives in exchange for the tourists visiting the local resorts and attending sales presentations." (Ex. B at 10).  These entities are clearly described as "marketing agents." (*Id.*).  Because there is sufficient evidence showing RCI authorized these "agents" to "solicit tourists," there is a genuine issue for trial as to whether RCI is liable under a theory of actual authority.

## 2.  **Apparent authority**

"Apparent authority is the power 'to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Symmetry*, 2022 WL 2072875 at *14 (quoting *DeClements v. RE/MAX LLC*, No. 1:20-CV-02075 DDD/SKC, 2020 WL 9259326, at *3 (D. Colo. Oct. 13, 2020)).  In *Dish Network*, the FCC provided a useful, but not exhaustive, list of

15

"examples of evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's section 227(b) violations." *Id.* (quoting 28 F.C.C. Rcd. at 6592).  Two such examples are: (1) a showing of "the [agent's] authority to use the seller's trade name, trademark and service mark", and (2) "a showing that 'the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.'" *Id.* (quoting *Dish Network*, 28 F.C.C. Rcd. at 6592).

There is sufficient evidence showing RCI is liable under a theory of apparent authority. First, RCI permits sales teams at the resorts mentioned during the calls to use RCI branding and logos on marketing material. (Ex. J at 106:18–110:15).  Second, a phone representative from the February 8, 2018 call used RCI's tradename when he said that he was calling from a "marketing division under RCI." (Ex. A at ¶ 32; Ex. E at 10; February 8, 2018 Return Call Transcript at 4). Third, MXRRU affiliates and officers, including Mr. Arroyo, have been connected to multiple publicized, federal investigations related to illegal telemarketing, conduct RCI should have been aware of. (Ex. I; Ex. M at 4).  Because there is sufficient evidence showing RCI is liable under a theory of apparent authority, there is a genuine issue for trial on that point.

### 3.  Ratification

A TCPA defendant can be held liable if it "had knowledge of facts [about a telemarketer] that would have led a reasonable person to investigate further, but the [defendant] ratified without further investigation." *See McCurley v. Royal Seas Cruises, Inc.*, No. 21-55099 (9th Cir. Apr. 5, 2022) (quoting Restatement (Third) of Agency § 2.03).  "[T]aking deliberate steps to ensure one's

own ignorance of a . . . telemarketer's [illegal conduct] is an ineffective strategy to avoid liability." *FTC v. Chapman*, 714 F.3d 1211, 1216–1219 (10th Cir. 2013).

There is sufficient evidence showing RCI is liable under a theory of ratification.  First, as explained above, MXRRU affiliates and officers, including Mr. Arroyo, have been connected to multiple publicized, federal investigations related to illegal telemarketing. (Ex. I; Ex. M at 4).  Second, RCI gave sales awards based on the number of enrollments generated at the sales presentations Plaintiff was required to attend as a condition of his purchase. (Ex. S; Ex. J at 63:5–69:19).  Because there is sufficient evidence showing RCI ratified the telemarketing scheme, there is a genuine issue for trial on that point.

### C.  There is sufficient evidence showing how the calls were made.

The Motion argues, without any case support, that four of the counts must be dismissed because "there is no evidence showing what technology was used to initiate the calls in question." (Mot. at 22).  The Motion does not point to any evidence showing that the technology used *does not* satisfy any of the characteristics described in the four counts, including being an automatic telephone dialing system ("ATDS").  Rather, the Motion simply ignores much of the evidence and argues that there is no evidence showing how the calls were made.  But there is sufficient evidence showing how the calls were made.

### 1.  There is sufficient evidence showing the calls were made with an ATDS.

When largely denying RCI's motion to dismiss at the pleading stage, the Court outlined several allegations in the original complaint that, if true, could plausibly establish ATDS usage:

> Plaintiff's [original] complaint alleges (a) his lack of a business relationship with Defendants; (b) Defendants' efforts to obfuscate their identity (potentially to hide their use of an ATDS); and (c) his receipt of over twenty-five similar pre-recorded, automated messages from specifically identified numbers (despite his lack of his consent, his request to not be contacted, and his Do Not Call

> registration).  And if Plaintiff lacked any business relationship with Defendants—and was a Do Not Call registrant who specifically asked Defendants to stop calling—it is plausible that Defendants used the alleged ATDS (as opposed to a pre-produced list that could, for example, be filtered through the Do Not Call Registry or a separate list of callers who expressly asked for the calls to stop) to produce or store Plaintiff's number in connection with their telemarketing efforts.  In sum, when the above facts are assumed to be true and viewed together, they plausibly suggest that Defendants called Plaintiff using ATDS—i.e., telemarketing equipment with "the capacity to use a random or sequential number generator."

(Doc. 58 at 26–27) (quoting *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167–73 (2021)).

The evidence clearly establishes all of the elements above.  First, prior to the phone calls, Plaintiff did not have a business relationship with the callers. (Ex. A at ¶ 3).  Second, the callers concealed their identity by "spoofing" their phone numbers and at first saying they were calling from different company names, such as "Cancun Special Promotions," instead of MXRRU or the resorts they were promoting. (*Id.* at ¶¶ 4, 20; Ex. E at 13).  Third, Plaintiff received a total of twenty-seven calls with similar prerecorded, automated messages from phone numbers he has identified, despite his lack of consent to the calls, requests to not be called, and his Do Not Call registration. (*Id.* at ¶¶ 2, 4, 19; Ex. C; Ex. D).  Because the evidence meets the elements previously outlined by the Court, there is a genuine issue for trial as to whether the calls utilized an ATDS.

**2.  <u>There is sufficient evidence showing the calls violated 47 U.S.C. § 227(b)(1)(A)(iii) (Count One).</u>**

Section 227(b)(1)(A)(iii) prohibits the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to make calls "to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).  In the instant case, Plaintiff has produced thirteen audio recordings showing the calls began with prerecorded messages. (Ex. U; RCI's Exhibits D, E, G, H, J–M, O–R).  Plaintiff also has submitted a sworn declaration describing all of the calls as beginning with prerecorded messages. (Ex. A at ¶ 4).  Additionally, Plaintiff has

submitted a sworn declaration that his phone number is a cell phone, as well as phone bills showing that his phone number was connected to a cell phone. (*Id.*; Ex. D at 8–14).   Because there is evidence showing the calls were made with a prerecorded message to a cell phone, there is a genuine issue for trial as to Section 227(b)(1)(A)(iii).

### 3.   There is sufficient evidence showing the calls violated 47 U.S.C. § 227(b)(1)(D) (Count Three).

Section 227(b)(1)(D) prohibits the use of an ATDS in a way that "two or more telephone lines of a multi-line business are engaged simultaneously." *Id.* at § 227(b)(1)(D).   Plaintiff has submitted audio recordings where a phone representative states: "I'm in a huge call center with over a hundred in the room right now." (Ex. E at 34; April 3, 2018 Call Transcript at 22).   Because there is evidence showing the calls were being made from "a huge call center," likely with multiple phone representatives on multiple phone calls at once, there is a genuine issue for trial as to whether the calls were made with two or more telephone lines of a multi-line business engaged simultaneously.

### 4.   There is sufficient evidence showing the calls violated NMSA 1978, § 57-12-22(A) (Count Nine).

Section 57-12-22(A) of the New Mexico Statutes prohibits utilizing an ATDS with a prerecorded message. NMSA 1978, § 57-12-22(A).   As explained above, the evidence presents a genuine issue for trial as to ATDS usage, and there is clear evidence the calls were made with prerecorded messages.   Therefore, there is a genuine issue for trial as to whether the calling technology used during the calls violated Section 57-12-22(A).

### 5.   There is sufficient evidence showing the calls violated NMSA 1978, § 57-12-22(B)(7) (Count Twelve).

Section 57-12-22(B)(7) of the New Mexico Statutes prohibits the making of a telephone solicitation "using automatic dialing equipment that dials and engages the telephone numbers of

more than one person at a time but allows the possibility of a called person not being connected to the calling person for some period not exceeding that established by the federal trade commission at 16 C.F.R. Sections 310(b)(1)(iv) and 310.4(b)(4)[.]" NMSA 1978, § 57-12-22(B)(7).   The period of time established by Sections 310(b)(1)(iv) and 310.4(b)(4) is two seconds. *See* 16 C.F.R. §§ 310(b)(1)(iv) and 310.4(b)(4)(iii).   At its core, this section prohibits the use of predictive dialer technology.

The following is the FCC's description of a predictive dialer:

> A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call[.]
>
> […]
>
> [A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers[.]
>
> […]
>
> Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call…Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call.

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003) ("2003 FCC Order").

In plain English, a predictive dialer is pre-set like a sprinkler timer to dial phone numbers at pre-set intervals and pre-set time periods, based on how many available agents there are expected

to receive calls.  In crude terms, one can imagine a call center with 100 agents, a 10% chance that a call will be answered, and an average call length of one minute.  The predictive dialer will "predict" that it should place 1,000 calls per minute, because 100 of those calls will be answered, and so 100 agents will be available to speak with the consumer.  Once those agents get off the line, calls will already automatically be happening in the background, and agents will be connected with callers who pick up the line. This process is sometimes referred to as algorithmic dialing.

Plaintiff has presented audio recordings of the phone calls showing that during at least two of the calls—the February 8, 2018 call and the April 16, 2018 call—there was more than 24 seconds of hold music after the prerecorded message and prior to a phone representative coming on the line. (Ex. A at 6; RCI's Exhibits D, H).  And even though some phone representatives answered some of the calls within two seconds (after the prerecorded messages played), that simply means that a phone representative happened to be available within that time.  The underlying predictive dialer technology was still being used.[5]  Due to this evidence, there is a genuine issue for trial as to whether the calls were made with technology that violates NMSA 1978, § 57-12-22(B)(7).

**D.  <u>There is a private right of action under 47 C.F.R. § 64.1200(d)(4) (Count Eight).</u>**

The Motion argues (at 23–24) that there is no private right of action under 47 C.F.R. § 64.1200(d)(4).  Not true.  In recent years, courts throughout the Country have found that Subsection (d)(4) does provide a private right of action. *See Worsham v. Discount Power, Inc*, Civ. No. RDB-20-0008, at *8–9 (D. Md. Dec. 1, 2021) (listing cases); *Callier v. Debt Mediators, LLC*, No. EP-21-CV-278-DB, at *4 (W.D. Tex. May. 5, 2022) (finding that Subsection (d)(4) is

---

[5] Section 57-12-22(B)(7) prohibits technology that "allows the possibility" of a longer-than-two-second delay; it does not require that there be a two second delay. NMSA 1978, § 57-12-22(B)(7).

"enforceable by [plaintiff]").  Because Section (d)(4) provides a private right of action, RCI is not entitled to judgment as a matter of law for Plaintiff's claim under that section.

### E.  RCI is not entitled to any award of attorneys' fees.

The Motion argues (at 24–25) that RCI should be awarded its attorneys' fees because Plaintiff's claims are "groundless" since "none of the other calls [beyond the February 8, 2018 call] mentioned RCI."   However, Plaintiff's claims are far from groundless.   The Motion conveniently ignores the fact that vacation packages offered during the other calls were also for resorts within RCI's timeshare exchange network, and all the calls had similar characteristics like similar prerecorded messages and the same pricing for vacation packages.  Because Plaintiff's claims are not groundless, RCI is not entitled to any award of attorneys' fees.

## VII.   Conclusion

As explained above, there is a genuine issue for trial as to whether RCI is either directly or vicariously liable for the calls at issue.  There is also a genuine issue for trial as to the technology used to initiate the calls.  Lastly, Count Eight of the FAC is enforceable by Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court deny RCI's Motion for Summary Judgment in full.

*   *   *

Dated this 1st day of April, 2024.

Respectfully submitted,

/s/ Ruben J. Escano

**Ruben J. Escano,** *pro se*
2311 Ranch Club Road
Suite #2-180
Silver City, NM 88061
rubenescano@gmail.com
(201) 527-8938

IT IS HEREBY CERTIFIED that on this 1st day of April, 2024, the foregoing was filed electronically through the CM/ECF system, causing all parties or counsel of record to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

By:  /s/ Ruben J. Escano

**Ruben J. Escano**, *pro se*