## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RUBEN ESCANO,

      Plaintiff,

v.

RCI, LLC, *et al.*,

      Defendants.

Case No. 2:22-cv-00360-DHU-GJF

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
## AS TO DEFENDANT MEXICAN RIVIERA RESORTS UNLIMITED, S.A. DE C.V.

In accordance with Fed. R. Civ. P. 55(b), Plaintiff Ruben Escano, undersigned, hereby respectfully moves for default judgment as to Defendant Mexican Riviera Resorts Unlimited, S.A. de C.V. ("MXRRU"), the remaining defendant in this case. For the reasons set forth below, Plaintiff respectfully requests that the Court enter default judgment as to MXRRU in the amount of $313,800 and post-judgment interest.

### I.    Preliminary Statement

As alleged in the Amended Complaint, (Doc. 80), despite Plaintiff listing his phone number on the National Do Not Call Registry, between February 8, 2018 and January 20, 2021, MXRRU made 27 automatically-dialed and unsolicited telemarketing calls to Plaintiff's cell phone. (Am. Compl. at ¶¶ 15, 20). All of the calls began with prerecorded messages falsely announcing the calls as coming from well-known hospitality companies, such as Hilton and Marriott. (*Id.* at ¶ 23). In reality, the calls were made to sell vacation packages contingent on Plaintiff enduring a timeshare sales presentation at resorts operated by affiliates of MXRRU. (*Id.* at ¶¶ 74–75). The

calls persisted even though Plaintiff requested that the phone representatives to whom Plaintiff spoke, place his phone number on a do-not-call list. (*Id.* at ¶¶ 94, 96, 108).

Thus, Plaintiff brings claims under the U.S. Telephone Consumer Protection Act ("TCPA"), codified as 47 U.S.C. § 227, and the New Mexico Unfair Practices Act ("UPA"), codified as N.M. Stat. Ann. § 57-12. MXRRU is no stranger to telemarketing laws like the TCPA and UPA. In 2017, the Federal Communications Commission imposed a $120 Million fine against an individual conducting telemarketing on behalf of MXRRU's affiliate. *See* (Doc. 209-13 at 2). And in 2011, another affiliate of MXRRU was found to be making "30,000 and 40,000 calls per day" in violation of Canadian telemarketing laws. *See* (Doc. 209-9 at 2).

## II.    **Relevant Procedural Background**

On April 4, 2022, Plaintiff commenced this case by filing the original complaint, (Doc. 1-1), in New Mexico state court. *See* (*id.* at 2). On May 9, 2022, MXRRU removed the case to this Court. *See* (Doc. 1). On January 18, 2023, after the Defendants filed dispositive motions which were largely denied, *see* (Doc. 58), they filed answers to the original complaint, (Docs. 61–63). On April 6, 2023, Plaintiff filed his Amended Complaint. (Doc. 80). The Amended Complaint continues the main allegations of the original complaint, but deletes two counts and adds three more. On April 20 and 21, 2023, Defendants filed their answers to the Amended Complaint. (Docs. 84–86). The Amended Complaint is now the operative complaint.[1]

On June 28, 2023, MXRRU's attorneys requested to withdraw from this case. (Doc. 103). On July 13, 2023, the Court granted the request and warned MXRRU that failure to appear via counsel (or show cause) by August 31, 2023 would result in MXRRU's default. (Doc. 107 at 2).

---

[1] References herein to "the complaint" refer to the Amended Complaint, unless otherwise specified.

MXRRU did not appear, and on September 14, 2023, the Court ordered the Clerk to enter default for MXRRU. (Doc. 134). That same day, the Clerk entered default for MXRRU. (Doc. 135).

On September 20, 2024, the Court largely denied Defendant RCI, LLC's ("RCI") Motion for Summary Judgment. (Doc. 235). On December 10, 2024, Plaintiff settled his case against RCI. (Doc. 258). After settlement terms were satisfied, on March 8, 2025, Plaintiff filed a motion for voluntary dismissal as to RCI. (Doc. 263). On March 20, 2025, the Court granted the motion and dismissed RCI. (Doc. 264). Thus, Plaintiff now moves for default judgment against MXRRU, the remaining Defendant.

## III.    **Legal Standard**

"When a defendant fails to answer or otherwise defend against an action, Rule 55 of the Federal Rules of Civil Procedure provides two distinct sequential steps: the entry of default and the entry of default judgment." *Mohon v. Spiller, et al.* 2023 WL 6463477, at *3 (D.N.M. Oct. 4, 2023) (Urias, J.) (citations omitted); Fed. R. Civ. P. 55(a), (b). "First, a party must obtain a Clerk's entry of default." *Id.* (quoting *Branch v. Att'y for You*, No. 1:15-CV-01087-RAJ, 2016 WL 7438410, at *2 (D.N.M. June 7, 2016)). "After default has been entered, the party may seek default judgment." *Id.* at *3–4 (citing *Garrett v. Seymour*, 217 Fed. App'x. 835, 838 (10th Cir. 2007) (unpublished)). "Upon default, the defendant admits the plaintiff's allegations." *Id.* (citing *Olcott v. Del. Flood Co.*, 327 F.3d 1115, 1125 (10th Cir. 2003)).

The analysis on a motion for default judgment involves determining "whether [the court] has jurisdiction, whether the facts establish a legitimate basis for the entry of judgment, and whether the amount of damages can be ascertained." *Id.* at *4 (quoting *Plumbers & Pipefitter Nat'l Pension Fund v. CYLX Corp.*, No. 19-CV-113-JFH-JFJ, 2021 WL 6053686, at *1) (citation omitted). A court may enter a default judgment without a hearing "if the amount claimed is a

liquidated sum or one capable of mathematical calculation." *Id.* at *10 (quoting *Hunt v. Inter–Globe Energy, Inc.,* 770 F.2d 145, 148 (10th Cir. 1985)).  "A court is not required to accept the plaintiff's legal conclusions or factual allegations when assessing damages and must ensure that there is a legal basis for the damages specified in the default judgment." *Id.* (quoting *Mohon v. Nat'l Cong. of Emps., Inc.*, No. 119CV00652KWRJHR, 2021 WL 601816, at *2 (D.N.M. Feb. 16, 2021)).

IV.    **Argument**

   A.    **Jurisdiction**

This Court has jurisdiction over Plaintiff's claims.  "[T]his case involves claims under both federal law (the TCPA) and state law (the UPA) so jurisdiction rests on a federal question, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367." *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *4.

This Court has specific jurisdiction over MXRRU.  "Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at *5 (quoting *C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1323 (10th Cir. 2019)).  "[I]n the context of the TCPA, … courts have held that personal jurisdiction is proper in the District where an unlawful communication is received." *Id.* at *5–6 (quoting *Mey v. Castle L. Grp., PC*, 416 F. Supp. 3d 580, 586 (N.D.W. Va. 2019)) (citing *Payton v. Kale Realty, L.L.C.*, No. 13 C 8002, 2014 WL 4214917, at *3 (N.D. Ill. Aug. 26, 2014) ("[C]ourts have repeatedly held that sending a message into the forum state in violation of the TCPA is sufficient to confer specific personal jurisdiction over the defendant.")).

The Amended Complaint alleges that "Plaintiff is a resident of New Mexico and was in New Mexico at the time a preponderance of the calls described herein were received." (Am. Compl. at ¶ 11).  And Plaintiff has filed an affidavit, declaring that "the last nine of these calls [were received] in Silver City, New Mexico." *See* Affidavit of Ruben Escano, attached hereto as Exhibit A at ¶ 5.  Thus, as alleged in the Amended Complaint (at ¶¶ 12–13), MXRRU purposefully availed itself of the privilege of conducting business in the State of New Mexico. *See Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *6 (citing *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1224-26 (10th Cir. 2021) (out-of-state telemarketer's calls to Colorado consumers to sell service contracts supported specific jurisdiction)).  Accordingly, the Court has jurisdiction over the subject matter and MXRRU.

**B.  Liability**

**1.  MXRRU or Its Agent Called Plaintiff.**

"The first element of a TCPA claim is that the defendant called a cellular telephone number." *Baalen v. Mut. of Omaha Ins. Co.*, 729 F. Supp. 3d 1239, 1246 (D.N.M. 2024) (Urias, J.) (internal quotations omitted).  "Defendants in TCPA actions may be held either directly or vicariously liable for making calls." *Id.* (citing *Thomas v. Taco Bell Corp.*, 582 Fed. Appx. 678, 679 (9th Cir. 2014) ("There are two potential theories of liability: (1) direct liability; and (2) vicarious liability.")).  "Direct liability is imposed upon persons that make a telephone call or text." *Id.* (internal quotations omitted).  "Vicarious liability attaches where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." *Id.* (internal quotations omitted).  Vicarious liability "includes a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *7 (D.N.M. Oct. 4, 2023) (Urias, J.)

(quoting *Hossfeld v. Gov't Emps. Ins. Co.*, 88 F.Supp.3d 504, 510 (D. Md. 2015). "In short, for a person to make a call under the TCPA, the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call." *Baalen*, 729 F. Supp. 3d 1239, 1246.

In the instant case, the Amended Complaint sufficiently pleads that MXRRU is directly or vicariously liable for the calls at issue. In particular, the Amended Complaint alleges that MXRRU initiated the 27 calls at issue. *See* (Am. Compl. at ¶¶ 15, 88, 90–93, 95, 97–107, 109–118). The Amended Complaint also specifies the phone numbers from which MXRRU called and the dates of those calls. *See* (*id.*). Additionally, the Amended Complaint alternatively alleges that MXRRU authorized a third-party caller to make the calls and thus MXRRU is vicariously liable for them. *See* (*id.* at ¶ 32) (alleging in part that "a John Doe Defendant acted as an agent of MXRRU [. . .] in furtherance of MXRRU['s . . .] telemarketing enterprise.").

Moreover, Plaintiff alleges that during one call he attempted to determine the true identity of who was calling. (*Id.* at ¶ 47). To that end, he gave his credit card information to a phone representative. (*Id.*). Plaintiff's credit card statement showed a subsequent charge from "MXRRU." (*Id.* at ¶ 48). Plaintiff has submitted a copy of his credit card statement showing that charge. (Ex. A at ¶ 7); (Doc. 209-6 at 2). Plaintiff has also submitted his phone records showing the calls at issue, (Doc. 209-4), and transcripts of audio recordings of many of the calls, (Doc. 209-5). (Ex. A at ¶¶ 4, 6). Thus, the Amended Complaint satisfies the first threshold element of a TCPA claim. *See Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *7.

At the pleading stage, Plaintiff conceded that the first call, out of the 27, was outside of the statute of limitations. (Doc. 58 at 7). Thus, the relief requested herein is limited to the 26 later calls.

**2.** __During the 26 Calls, MXRRU Violated Three Distinct Provisions of Section 227(b) of the TCPA 78 times.__

Moving on to the individual counts, the complaint brings three distinct claims under Section 227(b) of the TCPA. *See* (Am. Compl. at ¶¶ 119–127) (Counts 1 through 3). It seeks damages for these claims pursuant to Section 227(b)(3)(B) of the TCPA. *See* (*id.* at 24, ¶ A) (Prayer for Relief). The three counts brought under Section 227(b) are as follows:

__Count One__ alleges that MXRRU violated 47 U.S.C. § 227(b)(1)(A)(iii). *See* (Am. Compl. at ¶ 121). This provision of the TCPA prohibits automatically-dialed calls to cell phones. *See* 47 U.S.C. § 227(b)(1)(A)(iii) ("It shall be unlawful for any person . . . to make any call [with limited exceptions] using an automatic telephone dialing system ["ATDS"] . . . to any telephone number assigned to a . . . cellular telephone service[.]"). The complaint indeed alleges that MXRRU called Plaintiff's cell phone and used an ATDS to do so. *See* (Am. Compl. at ¶¶ 15, 120). Specifically, as for MXRRU's ATDS usage, this Court has already analyzed the statutory definition of an ATDS and found that "the factual allegations in the [original] Complaint plausibly suggest that [MXRRU . . .] called Plaintiff's cell phone using an ATDS[.]" (Doc. 58 at 23–24, 25) (*Proposed Findings and Recommended Disposition on Defendants' Motion to Dismiss* ("PFRD"), adopted by the Court on January 4, 2023 in Document 59) (brackets omitted).[2] And Plaintiff alleges numerous times throughout the complaint that his phone is a cell phone. *See* (Am. Compl. at ¶¶ 15, 18, 20, 41, 86). Thus, by defaulting, MXRRU admits to 26 violations of 47 U.S.C. § 227(b)(1)(A)(iii).

__Count Two__ alleges that MXRRU violated 47 U.S.C. § 227(b)(1)(B). *See* (Am. Compl. at ¶ 124). This provision of the TCPA, makes it illegal "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the

---

[2] The allegations regarding ATDS usage in the original complaint were carried over to the amended complaint.

prior express consent of the called party," with limited exceptions not applicable here. 47 U.S.C. § 227(b)(1)(B).  The complaint indeed alleges that MXRRU initiated the calls in such manner. (Am. Compl. at ¶¶ 36, 123).  Specifically, as for the allegation that MXRRU used a prerecorded message during the calls, the complaint quotes many of the messages, and alleges that all of them falsely and "deceptively announc[ed] the calls as coming from 'Marriott Hotels,' 'Hyatt Hotels,' 'Hilton Hotels,' 'Disney World,' or 'Booking.com.'" *See* (Am. Compl. at ¶¶ 2, 23–24).  The complaint also alleges that all of the prerecorded messages "were made with the same woman's voice and with similar excited intonations and cadence." *See* (Am. Compl. at ¶ 27).  The complaint alleges in part that those well-known hospitality companies do not transmit such prerecorded messages, and that MXRRU "referenced these well-known names and trademarks, to legitimize [its] scheme." *See* (*id.* at ¶¶ 25 –26).

Additionally, this Court, like others to consider the issue, has analyzed the term "residential phone" in subsection 227(b)(1)(B) and found that a cell phone like Plaintiff's is a residential phone. (PFRD at 24–25, 27–29) ("the [original] Complaint alleges facts that plausibly suggest Plaintiff's cell phone qualifies as 'residential' under the applicable statutes.").  And the complaint also sufficiently alleges that MXRRU made the calls without the prior express consent of Plaintiff. (Am. Compl. at ¶ 36) (alleging "Defendants have not received from Plaintiff any prior express invitation or permission to call him."); *see also Baalen*, 729 F. Supp. 3d 1239, 1249-50 (denying motion to dismiss when the plaintiff alleged that he "never gave prior express written consent to receive telephone solicitations from Defendants or their agents" [3]).  Thus, MXRRU admits to 26 violations of 47 U.S.C. § 227(b)(1)(B).

---

[3] Although the Amended Complaint does not explicitly allege that MXRRU's *agent* lacked prior express consent, the Court can infer this.  This is because MXRRU's agent is named as a John Doe Defendant, *see* (Am. Compl. at ¶¶ 9, 32), and therefore is one of the "Defendants" implicated in paragraph 36 of the Amended Complaint.  Thus, the

**Count Three** alleges that MXRRU violated 47 U.S.C. § 227(b)(1)(D). *See* (Am. Compl. at ¶ 127). This provision of the TCPA prohibits using an ATDS "in such a way that two or more telephone lines of a multi-line business are engaged simultaneously." 47 U.S.C. § 227(b)(1)(D). The complaint indeed alleges that MXRRU used an ATDS in such a manner. *See* (Am. Compl. at ¶ 126). The subsection does not differentiate between a multi-line business that receives a call or a multi-line business that makes the call. This Court has already found that "the factual allegations in the [original] Complaint plausibly suggest that [MXRRU . . .] 'used an ATDS in such a way that two or more telephone lines of a multi-line business are engaged simultaneously[.]'" (PFRD at 25) (quoting § 227(b)(1)(D)) (brackets omitted).

Plaintiff has also presented evidence showing that MXRRU, or its agent, was calling from a sophisticated call center where multiple lines were engaged at once. In particular, Plaintiff produced an audio recording where a phone representative says "I'm in a huge call center with over a hundred in the room right now[,]" (Ex. A at ¶ 6, Doc. 209-5 at 22), a piece of evidence the Court considered when denying Defendant RCI, LLC's motion for summary judgment as to Count Three. (Doc. 235 at 17) (*Memorandum Opinion and Order* on RCI's Motion for Summary Judgment). Thus, by defaulting, MXRRU admits to 26 violations of 47 U.S.C. § 227(b)(1)(D).

### 3. During the 26 calls, MXRRU Violated Five Distinct Provisions of Section 227(c) of the TCPA 100 times.

The complaint also brings five distinct claims under Section 227(c) of the TCPA. *See* (Am. Compl. at ¶¶ 128–144) (Counts 4 through 8). It seeks damages for these five claims pursuant to Section 227(c)(5)(B). *See* (*id.* at 24, ¶ A) (Prayer for Relief). As a threshold matter, this subsection of the TCPA "allows a private right of action for 'a person who has received more than one

---

complaint sufficiently alleges that MXRRU's agent did not receive from Plaintiff any prior express consent, just like MXRRU itself.

telephone call within any 12-month period by or on behalf of the same entity' in violation of the prescribed regulations." *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *8 (quoting *Mestas v. CHW Grp. Inc.*, 508 F.Supp.3d 1011, 1027 (D.N.M. 2020) (quoting 47 U.S.C. § 227(c)(5))) (brackets omitted). The complaint alleges that each of the calls at issue were received within a twelve-month period of at least one other call. *See* (Am. Compl. at ¶¶ 88, 90–93, 95, 97–107, 109–118) (alleging the dates of each of the calls). Thus, the complaint meets this threshold requirement. The five counts brought under Section 227(c) are as follows:

**Count Four** alleges that MXRRU violated 47 C.F.R. § 64.1200(a)(7)(i). *See* (Am. Compl. at ¶ 130). This provision of the TCPA makes it illegal to fail to connect a telemarketing call to a live phone representative within two seconds without providing, among other things, an "opt-out message" that "states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual[.]" 47 C.F.R. § 64.1200(a)(7)(i); *see also Dobronski v. Baid*, No. 24-10297, at *10–11 (E.D. Mich. Aug. 29, 2024) (explaining the provision and denying a defendant's motion to dismiss). In other words, the provision prohibits more than two seconds of silence at the beginning of a telemarketing call without providing such an opt-out message. The complaint specifies the date and time of the call in which Plaintiff heard more than two seconds of silence as May 14, 2018 at 4:33 pm. (Am. Compl. at ¶ 129). And the complaint alleges that Plaintiff was not provided a telephone number during this May 14, 2018 call. *See* (Am. Compl. at ¶ 143). Thus, by defaulting, MXRRU admits to one violation of 47 C.F.R. § 64.1200(a)(7)(i).

**Count Five** alleges that MXRRU violated 47 C.F.R. § 64.1200(c)(2). *See* (Am. Compl. at ¶ 133). This provision of the TCPA prohibits initiating "any telephone solicitation to . . . a residential telephone subscriber who has registered his or her telephone number on the national

do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained

by the Federal Government." *Cleveland v. Nextmarvel Inc.*, Civil Action TDC-23-1918, at *4 (D.

Md. Jan. 18, 2024) (quoting 47 C.F.R. § 64.1200(c)(2)) (brackets omitted).  The complaint alleges

that MXRRU called Plaintiff's phone number despite it being listed on the registry "for over a

decade." (Am. Compl. at ¶¶ 20, 132).  Plaintiff has also submitted an email confirmation showing

his phone number has been listed on the registry since October 18, 2008. (Ex. A at ¶ 3); (Doc. 209-

3 at 2).  Additionally, the complaint alleges, (at ¶¶ 33–37), that the calls were "initiated for the

purpose of encouraging the purchase of goods or services" which meets the definition of a

"telephone solicitation" under 47 C.F.R. § 64.1200(c)(2) and 47 U.S.C. § 227(a)(4). *See Cleveland

v. Nextmarvel Inc.*, Civil Action TDC-23-1918, at *4.  Thus, MXRRU admits to 26 violations of

47 C.F.R. § 64.1200(c)(2).

**Count Six** alleges that MXRRU violated 47 C.F.R. § 64.1200(d)(1)-(2). *See* (Am. Compl.

at ¶ 137).[4]  This provision of the TCPA makes it illegal to "fail to have a written policy for

maintaining a do-not-call list." *Dobronski v. Baid*, No. 24-10297, at *9 (citing 47 C.F.R. §

64.1200(d)(1)); *see also Dobronski v. Selectquote Ins. Servs.*, 462 F. Supp. 3d 784, 791 (E.D.

Mich. 2020).  The complaint alleges that MXRRU failed to have such an internal do-not-call list

when each of the calls were initiated. (Am. Compl. at ¶ 135, 137).  Thus, MXRRU admits to 26

violations of 47 C.F.R. § 64.1200(d)(1)-(2).

**Count Seven** alleges that MXRRU violated 47 C.F.R. § 64.1200(d)(3). *See* (Am. Compl.

at ¶ 141).  "To prove a TCPA violation based on 47 C.F.R. § 64.1200(d)(3), a plaintiff must

establish: (1) more than one telephone call within any 12-month period; (2) for the purpose of

---

[4] Plaintiff merges together subsections 64.1200(d)(1) and (2) because subsection (d)(1) requires that a written do-not-call policy be maintained, while (d)(2) requires that personnel be trained in the proper use of such a policy.  Logically, if such a policy does not exist, personnel cannot be trained on it.  Therefore, Plaintiff is treating both subsections as one, instead of seeking damages for each subsection.

encouraging the purchase or rental of, or investment in. property, goods, or services; (3) by or on behalf of the same entity; (4) that fails to honor the recipient's prior do-not-call request: (5) within a reasonable time after the date such request was made." *Cleveland v. Nextmarvel Inc.*, Civil Action TDC-23-1918, at *6 (citing 47 U.S.C. § 277(c)(5); 47 C.F.R. § 641.1200(d)(3)).

As shown above, the complaint already establishes the first three elements of a violation of subsection 64.1200(d)(3). The complaint also satisfies the other two elements. In particular, the complaint alleges that during the May 1, 2018 call,[5] Plaintiff told a phone representative "that he did not want to be called again and to place his phone number on a 'do not call' list." (Am. Compl. at ¶¶ 93–94). Nonetheless, the calls continued for nearly three years, despite Plaintiff requesting, at least two additional times, that his phone number be placed on a do-not-call list. *See* (Am. Compl. ¶¶ 96, 108, 118). Thus, for the 22 calls made after this do-not-call request, MXRRU admits to 22 violations of 47 C.F.R. § 64.1200(d)(3).

**Count Eight** alleges that MXRRU violated 47 C.F.R. § 64.1200(d)(4). *See* (Am. Compl. at ¶ 144). This provision provides that "[a] person or entity making [. . .] any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." 47 C.F.R. § 64.1200(d)(4). The complaint alleges that MXRRU failed to provide such information. (Am. Compl. at ¶ 143). Thus, MXRRU admits to 25 violations 47 C.F.R. § 64.1200(d)(4).[6]

---

[5] Although the Amended Complaint alleges that Plaintiff requested that his phone number be placed on a do-not-call list during the first call on February 8, 2018, Plaintiff later realized that that phone call may not have technically qualified as a do-not-call request. Plaintiff attempted to correct the error in his proposed second amended complaint. Although Plaintiff's request to amend was denied (largely because it was filed after the deadline to amend), *see* (Doc. 190 at 1), Plaintiff will maintain that the first do-not-call request was on May 1, 2018, not February 8, 2018.

[6] Plaintiff is deleting one call from Count Eight because, technically, he was provided with a phone number during the call where he needed to buy the promoted vacation package to determine who was responsible for the call. *See* (Am. Compl. at ¶¶ 47–49).

**4.** **During the 26 calls, MXRRU Violated Six Distinct Provisions of the UPA 156 times.**

Moving on to the state-law claims, the Amended Complaint alleges six distinct claims under the UPA. *See* (Am. Compl. at ¶¶ 145–166) (Counts 9 through 14). It seeks damages for these claims pursuant to N.M. Stat. Ann. § 57-12-10(B). *See* (*id.* at 24, ¶ C) (Prayer for Relief).

**Count Nine** alleges MXRRU violated N.M. Stat. Ann. § 57-12-22(A). (Am. Compl. at ¶ 148). This provision of the UPA "prohibits 'utiliz[ing] an automated telephone dialing or push-button or tone-activated address signaling system with a prerecorded message to solicit persons to purchase goods or services unless there is an established business relationship between the persons[.]'" *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *9 (quoting N.M. Stat. Ann. § 57-12-22(A)). As with the analogous TCPA claims of Counts One and Two, explained above, the complaint alleges specific facts as to MXRRU's use of an automated telephone dialing system with prerecorded messages. *See* (Am. Compl. at ¶¶ 2, 23–24, 25–27, 33, 35, 146–147). Thus, by defaulting, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(A) by MXRRU.

**Count Ten** alleges MXRRU violated N.M. Stat. Ann. § 57-12-22(B)(1). (Am. Compl. at ¶ 152). This provision "prohibits a person from 'mak[ing] a telephone solicitation for a purchase of goods or services' 'without disclosing within fifteen seconds of the time the person being called answers the name of the sponsor and the primary purpose of the contact.'" *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *9 (quoting N.M. Stat. Ann. § 57-12-22(B)(1)). The complaint indeed alleges that during the calls, MXRRU failed to make such plain disclosures within 15 seconds. *See* (Am. Compl. at ¶¶ 35, 150–151). Thus, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(B)(1).

**Count Eleven** alleges MXRRU violated N.M. Stat. Ann. § 57-12-22(B)(2). *See* (Am. Compl. at ¶ 157). The Court has previously found that this provision of the UPA "provides that

13

'it is unlawful . . . for a person to make a telephone solicitation for a purchase of goods or services that misrepresents the primary purpose of a telephone solicitation of a residential subscriber as a "courtesy call", a "public service information call" or some other euphemism.'" (PFRD at 29) (quoting N.M. Stat. Ann. § 57-12-22(B)(2)).

The Court found that the original complaint's allegations of prerecorded messages falsely purporting to be offering a "complimentary stay" from well-known hospitality companies (*e.g.*, Marriot Hotels, Hyatt Hotels, Disney World, etc.) sufficiently alleged the callers misrepresented the primary purpose of the call and used a euphemism to do so. *See* (PFRD at 29–30) (finding that the language used in the prerecorded messages "surely qualifies as 'some other euphemism'"). Plaintiff carried over these allegations into the Amended Complaint (at ¶¶ 2, 19, 23–25, 44–45, 63). And Plaintiff clearly alleges that these statements by MXRRU "misrepresented the primary purpose of the call[s]." (Am. Compl. at ¶¶ 154–156). Thus, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(B)(2).

**Count Twelve** alleges MXRRU violated N.M. Stat. Ann. § 57-12-22(B)(7). *See* (Am. Compl. at ¶ 160). This provision of the UPA provides that "it is unlawful . . . for a person to make a telephone solicitation for a purchase of goods or services using automatic dialing equipment that dials and engages the telephone numbers of more than one person at a time but allows the possibility of a called person not being connected to the calling person for some period not exceeding" two seconds. N.M. Stat. Ann. § 57-12-22(B)(7); 16 C.F.R. § 310.4(b)(4). The complaint alleges that MXRRU used such equipment during the calls. (Am. Compl. at ¶ 159). In particular, the complaint alleges that the type of dialing equipment MXRRU used was a "predictive dialer." (Am. Compl. at ¶ 129).

The following is the FCC's description of a predictive dialer:

> A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call
>
> [. . .]
>
> Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call…Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call.

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003).

In other words, a predictive dialer is pre-set like a sprinkler timer to dial phone numbers at pre-set intervals and pre-set time periods, based on how many available agents there are expected to receive calls.  In crude terms, one can imagine a call center with 100 agents, a 10% chance that a call will be answered, and an average call length of one minute.  The predictive dialer will "predict" that it should place 1,000 calls per minute, because 100 of those calls will be answered, and so 100 agents will be available to speak with the consumer.  Once those agents get off the line, calls will already be automatically happening in the background, and agents will be connected with callers who pick up the line. This process is sometimes referred to as algorithmic dialing.

The complaint alleges specific facts related to Plaintiff's interaction with the calls suggesting that a predictive dialer was used.  In particular, Plaintiff alleges that during the May 14, 2018 call, he heard more than two seconds of silence at the beginning of the call. (Am. Compl. at

¶ 129).[7]  And even though the other calls did not begin with more than two seconds of silence, this is merely representative of the natural statistical variation inherent in a predictive dialer.  Thus, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(B)(7).

 **Count Thirteen** alleges that MXRRU violated N.M. Stat. Ann. § 57-12-22(C)(1). (Am. Compl. at ¶ 163).  This provision "makes it unlawful to 'make a telephone solicitation of a residential subscriber whose telephone number has been on the national do-not-call registry, established by the federal trade commission, for at least three months prior to the date the call is made[.]'" *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *9 (quoting N.M. Stat. Ann. § 57-12-22(C)(1)).  As with the analogous TCPA claim of Count Five, the complaint alleges that MXRRU called Plaintiff 26 times, despite his phone number being listed on the National Do Not Call Registry for more than a decade. (Am. Compl. at ¶¶ 20, 162).  Thus, by defaulting, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(C)(1).

 **Count Fourteen** alleges that MXRRU violated N.M. Stat. Ann. § 57-12-22(C)(2). (Am. Compl. at ¶ 166).  This provision makes it unlawful to "use a method to block or otherwise intentionally circumvent a residential subscriber's use of a caller identification service pursuant to the Consumer No-Call Act."[8] *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *9 (quoting N.M. Stat. Ann. § 57-12-22(C)(2)).  The complaint alleges that MXRRU called Plaintiff 26 times in such a manner. (Am. Compl. at ¶ 165).

---

[7] The TCPA requires two seconds of silence at the beginning of the call to establish a violation under Count Four, but the UPA requires only the use of equipment that *could allow* for silence—*e.g.* a predictive dialer—to establish a violation under Count Twelve.

[8] The reference to the Consumer No-Call Act appears to be a vestigial phrase with little bearing on the reading of N.M. Stat. Ann. § 57-12-22(C)(2).  The Consumer No-Call Act was repealed in 2003 on the day the FFC adopted the delivery restrictions in 47 C.F.R. § 64.1200. *See* Notes of N.M. Stat. Ann. § 57-12-22(C)(2).  In subsection 57-12-22(C)(2), the phrase, "caller identification service pursuant to the Consumer No-Call Act" appears to simply mean that the meaning of "caller identification service" is defined in that act.  The act defined "caller identification service" as "a telephone service that permits telephone subscribers to see the telephone number of incoming telephone calls," which is now in 2025 the plain meaning of the term. *See* N.M. Stat. Ann. § 57-12A-2(A).  Thus, the reference to the repealed act is largely inconsequential today.

Additionally, the complaint alleges that MXRRU transmitted the calls in this manner as an attempt to further conceal its identity and thus avoid legal reproach. (Am. Compl. at ¶ 18).  And the complaint also alleges that during one of the calls, received during the height of the Covid-19 pandemic, Plaintiff's caller ID "erroneously indicated that the call was from 'Johnson and Johnson,'" the manufacturer of Covid-19 vaccines. (Am. Compl. at ¶¶ 84–86); (Ex. A at ¶ 8). Thus, MXRRU admits to 26 violations of N.M. Stat. Ann. § 57-12-22(C)(2).

## C. <u>Relief</u>

### 1. <u>Damages Under Section 227(b) of the TCPA Amount to $39,000.</u>

Subsection 227(b) plainly "allows $500 in damages for each 'violation of this subsection.'" *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *11 (citing 47 U.S.C. § 227(b)(3)); *Mohon v. Nat'l Cong. of Emps., Inc.*, No. 119CV00652KWRJHR, 2021 WL 601816, at *5 (D.N.M. Feb. 16, 2021).  Thus, the 78 violations of subsection 227(b) amount to $39,000 in damages.

### 2. <u>Damages Under Section 227(c) of the TCPA Amount to $50,000.</u>

The violations alleged in Counts Four through Eight are promulgated under subsection 227(c), which contains a private right action. *See* (Doc. 235 at 17–19) (this Court stating that "there is a private right of action for Section 64.1200(d) [Counts Six through Eight] because it was promulgated under Section 227(c)" and listing cases); *Dobronski v. Baid*, No. 24-10297, at *10–11 (E.D. Mich. Aug. 29, 2024) ("[o]ne of the regulations promulgated under [the TCPA] is 47 C.F.R. § 1200(a)(7)(i) [Count Four]"); *Dobronski v. Selectquote Ins. Servs.*, 462 F. Supp. 3d 784, 791 (E.D. Mich. 2020) ("a private right of action exists for a violation of 47 C.F.R. § 64.1200(d)(1) [Count Six]").

As for damages, section 227(c)(5) provides, in part:

> A person who has received more than one telephone call within any
> 12-month period by or on behalf of the same entity in violation of

the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State —

(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

47 U.S.C. § 227(c)(5).

Subsection 227(c) of the TCPA "expressly provides $500 for each violation." *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *11 (citing 47 U.S.C. § 227(c)(5)(B)). A Plaintiff can be awarded damages for multiple distinct violations of subsection 227(c). *See Hunsinger v. 204S6th LLC*, Civil Action 3:21-CV-2847-G-BH, (N.D. Tex. Mar. 23, 2022) (awarding damages for multiple violations of subsection 227(c)). Thus, the 100 violations of subsection 227(c) amount to $50,000 in damages.

Although subsection 227(c)(5) contains the word "call," that does not necessarily mean that violations are tallied on a per-call basis. A review of the language of the subsection shows that it promulgates awards on a per-violation basis, meaning that one call can contain multiple violations, just like subsection 227(b). This is true for three independent, logical reasons:[9]

---

[9] Plaintiff recognizes this Court's Opinion in *Mohon v. Spiller* (D.N.M. Oct. 4, 2023). In that case, the Court cites to *Mohon v. Nat'l Cong. of Emps., Inc.* (D.N.M. Feb. 16, 2021), which in turn cites to the 2009 Sixth Circuit case of *Charvat v. Gvn Michigan Inc.*, 561 F.3d 623 (6th Cir. 2009). In that case, the Sixth Circuit "relied on the word 'call' in the beginning of the sentence in § 227(c)(5), to conclude that 'each such violation' provides for damages on a per-call basis [for subsection 227(c) violations], and that § 227(b)(3) does not include the word 'call.'" *Charvat v. NMP*, LLC, 656 F.3d 440, 447 (6th Cir. 2011) (internal citation omitted). But as explained herein, the phrase "each such violation" cannot logically limit damages under subsection 227(c) to only a per-call basis. Additionally, this Court left open the possibility of a "per-violation" interpretation of subsection 227(c). *Mohon v. Spiller*, at *11 n.3 (D.N.M. Oct. 4, 2023) ("The Court does not address Plaintiff's argument that she is entitled to damages for 100 other distinct subsection C violations. This is because awarding Plaintiff such damages would result in her receiving more damages than she sought, which Plaintiff acknowledges.").

First, the word "call" in subsection 227(c)(5) is announcing merely a threshold requirement. The subsection allows a plaintiff to recover under subsection 227(c) only after the receipt of "more than one telephone call within any 12-month period[.]" After the threshold is met, a plaintiff may recover "up to $500 in damages for each" "violation of the regulations prescribed under this subsection[.]" Which means that the subsection allows for recovery on a per-violation basis, not a per-call basis. The word "call" is used to signify when the subsection is triggered, not how an award is calculated.

Second, Congress needed to use the word "call" in subsection 227(c)(5) precisely because the subsection allows for awards on a per-violation basis, not a per-call basis. As noted above, the subsection announces a threshold requirement that allows for recovery only after the receipt of more than one call. Simply put, Congress intended the subsection to be triggered after only two calls were received. But had Congress used the word "violation" instead of "call," the subsection would be triggered after just one call (because one call can contain multiple violations).

Third and finally, if Congress wanted to limit recovery under section 227(c) to a per-call basis, instead of a per-violation basis, Congress would have used the word "call" in subsection 227(c)(5)(B), instead of the word "violation." Put another way, instead of reading as it currently does—"receive up to $500 in damages for each such *violation*"[10]—Congress would have written the subsection simply as, "receive up to $500 in damages for each such *call*." But Congress chose to use the word "violation" where it's used, and chose to use the word "call" where it's used. As it currently reads, the statute allows for recovery of "up to $500 in damages for each such *violation*[.]" 47 U.S.C. § 227(c)(5)(B) (emphasis added).

---

[10] 47 U.S.C. § 227(c)(5)(B) (emphasis added).

"We must presume that Congress 'says in a statute what it means and means in a statute what it says there.'" *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).  "It is a fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by the courts.'" *Id.* at 361–62 (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 94 (2012) (brackets omitted)).  "[E]very statute is to be expounded reasonably, so as to suppress, and not to extend, the mischief[s] which it was designed to cure." *Sherwood v. Sutton*, 21 F. Cas. 1303, 1307 (No. 12,782) (CC NH 1828).

### 3.  <u>Damages Under the UPA Amount to $15,600.</u>

"The UPA provides that '[a]ny person who suffers any loss of money or property, real or personal, as a result of any . . . act or practice declared unlawful by the Unfair Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater.'" *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *12 (citing N.M. Stat. Ann. § 57-12-10(B)).  Damages under the UPA are calculated on a per-violation basis. *See id.*  Thus, the 156 violations of the UPA amount to $15,600 in damages.

### 4.  <u>Treble Damages are Warranted Under the TCPA and UPA.</u>

"The TCPA allows treble damages up to $1,500 for each violation that is committed 'willfully or knowingly.'" *Id.* (quoting *Ace Am. Ins. Co. v. Dish Network, LLC*, 883 F.3d 881, 885 (10th Cir. 2018)).  "The UPA also allows treble damages 'up to three times actual damages or three hundred dollars ($300), whichever is greater, to the party complaining of the practice,' if the court finds that a defendant has 'willfully engaged in the [complained of] trade practice.'" *Id.* (quoting N.M. Stat. Ann. § 57-12-10(B)).  The Amended Complaint alleges that MXRRU's violations were willful. (Am. Compl. at ¶¶ 119–166).

In *Mohon v. Spiller*, this Court awarded treble damages when the plaintiff submitted evidence "confirm[ing] the thrust of Plaintiff's allegations." *Mohon v. Spiller*, 1:22-cv-00108-DHU-LF, at *12. In particular, the plaintiff in that case submitted a Federal Communications Commission ("FCC") forfeiture order and a lawsuit submitted by several Attorneys General. *Id.*

In the instant case, Plaintiff has submitted a 2017 FCC Notice of Apparent Liability for Forfeiture against Adrian Abramovich, who made calls on behalf of a company owned by the President of MXRRU—Orlando Arroyo. (Ex. A at ¶ 11); (Doc. 209-13); *see* (Doc. 209-8) (compilation annual reports of MXRRU indicating Mr. Arroyo is its President). The FCC found that Abramovich "perpetrat[ed] one of the largest spoofed robocall campaigns that the Commission has ever investigated, involving nearly 100 million robocalls[.]" (Doc. 209-13 at 2). According to the FCC, these robocalls were associated with "senior executives and managers at the Sunset World Group." *See* (Doc. 209-13 at 5). Sunset World Group is a group of hotels and resorts promoted during the calls in the instant case. (Am. Compl. at ¶¶ 19, 45, 73). It is owned by Mr. Arroyo, the President of MXRRU. (Doc. 210-1 at 26:18–20, 46:12–13) (Deposition of Crystian Alatorre). According to the FCC, the robocalls began with prerecorded messages, similar to the ones in the instant case, about an "'exclusive' vacation deal offered by a well-known travel or hospitality company such as . . . Mariott, or Hilton." (Doc. 209-13 at 5). And "every reviewed call was spoofed" which led to "the display of misleading or inaccurate caller ID information . . . with unlawful intent," just like in the instant case. (*Id.* at 6).

Additionally, in 2011, the Canadian Radio-television Telecommunications Commission ("CRTC") found that Mr. Arroyo's companies were making tens of thousands of automatically-dialed calls to Canadian consumers, including many who had listed their phone numbers on the

Canadian National Do Not Call List. (Ex. A at ¶ 10); (Doc. 209-9 at 2). According to the CRTC, the callers purported to be calling from "well-known Canadian corporations." (*Id.*).

MXRRU has had ample notice about restrictions on telemarketing. It is clear that MXRRU's violations during its *third* robocalling spree—which include the calls alleged in the instant case—were willful. Thus, treble damages under the TCPA and UPA amount to $313,800.

It is also worth noting that much of the conduct by MXRRU goes far beyond the telemarketing restrictions promulgated by the TCPA or UPA. First, the calls persisted even after Plaintiff expressly requested—not once, not twice, but at least three separate times—that his phone number be placed on the company's do-not-call list.[11] Second, one of the phone numbers spoofed belonged to Johnson & Johnson, the manufacturer of a COVID-19 vaccine, which led Plaintiff to believe the call was an important phone call regarding his eligibility for a COVID-19 vaccine. *See* (Ex. A at ¶ 8). Third and finally, MXRRU usurped the tradenames of well-known, legitimate hospitality companies as part of its telemarketing scheme.

### D.  **Plaintiff is Entitled to Post-Judgment Interest.**

This District has previously found that:

> Post-judgment interest from the entry of a district court's judgment is mandatory under 28 U.S.C. §1961, which provides that postjudgment interest "shall be allowed on any money judgment in a civil case recovered in a district court" with interest calculated from the date of the entry of the judgment, "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." Further, post-judgment interest "shall be computed daily to the date of payment . . . and shall be compounded annually."

---

[11] The relevant regulation here—47 C.F.R. § 64.1200(d)(3) [Count Seven]—addresses a violation of only one do-not-call request. It does not contemplate that a defendant would egregiously ignore multiple do-not-call requests, like MXRRU has.

*Mohon v. Nat'l Cong. of Emps., Inc.*, No. 119CV00652KWRJHR, 2021 WL 601816, at *6–7 (D.N.M. Feb. 16, 2021) (citing 28 U.S.C. §§ 1961(a), 1961(b)); *See Boston Old Colony Ins. Co. et al v. Tiner Assoc., Inc., et al.*, 288 F.3d 222, 223 (5th Cir. 2002) (post-judgment interest is calculated at the federal rate).  Thus, Plaintiff respectfully requests that any default judgment the Court enters allows for Plaintiff to collect on post-judgment interest from MXRRU.

## V.    <u>Conclusion</u>

WHEREFORE, Plaintiff respectfully requests that the Court enter default judgment as to MXRRU in the amount of $313,800 and post-judgment interest.


Dated this 31st day of March, 2025.

Respectfully submitted,


/s/ Ruben J. Escano

**Ruben J. Escano,** *pro se*
2311 Ranch Club Road
Suite #2-180
Silver City, NM 88061
rubenescano@gmail.com
(201) 527-8938


IT IS HEREBY CERTIFIED that on this 31st day of March 2025, the foregoing was filed electronically through the CM/ECF system, causing all parties or counsel of record to be served by electronic means, as more fully reflected in the Notice of Electronic Filing.

By:    /s/ Ruben J. Escano
**Ruben J. Escano,** *pro se*